IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO.** |
| **THE GINTHER TRUSTS,** | § | **98-32663-11** |
| **A TEXAS JOINT VENTURE,** | | |
| | § | |
| **DEBTOR** | | |

---

| | | |
|---|---|---|
| **LISA LEE DE MONTAIGU,** | § | **ADV. NO.** |
| **LIQUIDATING TRUSTEE,** | | |
| | § | **06-3556** |
| **PLAINTIFF** | | |
| | § | |
| **VS.** | | |
| | § | |
| **NOBLE C. GINTHER, JR., CHARLES** | | |
| **E. LONG, Individually, and MORRIS** | § | |
| **LENDAIS, HOLLRAH & SNOWDEN** | | |
| | § | |
| **DEFENDANTS** | | |

**MEMORANDUM OPINION RELATING TO PLAINTIFF'S REQUEST FOR
PRELIMINARY INJUNCTION (DOCKET NO. 1)**

**I.**
**INTRODUCTION**

This post-confirmation adversary proceeding concerns a plan proponent who is flagrantly violating the terms of the very plan of which he obtained confirmation. It is no small irony that the person who seeks to enjoin this plan proponent from further violating his own plan is the trustee of the liquidating trust created under the plan; indeed, she is the person whom the plan proponent nominated to serve as trustee. It may be an even greater irony that this is now the second post-confirmation injunction that the trustee has had to obtain against the plan proponent to stop him from violating the terms of his own plan.

On September 8, 2006, Lisa Lee de Montaigu, in her capacity as liquidating trustee, filed a Complaint which included a Request for a Preliminary Injunction [Docket No. 1[1]]. This Court held a hearing on this Request on October 3, 24, 25, and 26, 2006. On October 26, 2006, this Court made oral findings of fact and conclusions of law in open court and granted the Plaintiff's Request for Preliminary Injunction. Set forth below are the Court's written findings of fact and conclusions of law. To the extent that these written findings of fact and conclusions of law conflict with any of the oral findings of fact and conclusions of law, the written findings of fact and conclusions of law govern. Otherwise, the written findings of fact and conclusions of law supplement the oral findings of fact and conclusions of law. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

## II.
## FINDINGS OF FACT

1.    On March 11, 1998, the Ginther Trusts filed a Chapter 11 petition [Main Case Docket No. 1]. The Ginther Trusts were characterized as a joint venture and were able to establish debtor status under 11 U.S.C. § 109(d).

2.    On May 10, 2001, this Court confirmed the Second Amended Ginther Plan of Reorganization (the Plan). The order confirming the Plan was also entered on the docket on May 10, 2001. [Main Case Docket Nos. 404 and 417].

3.    The Plan provided for payment to eleven classes of creditors or beneficiaries based on priority. Section 4.6 of the Plan describes payments to be made to Class 6 members, all of whom are beneficiaries. The four children of Noble Ginther, Sr.—Noble C. Ginther, Jr. (Noble), Edmond L. Ginther (Edmond), Marilyn Ginther Orr, now Eagle (Marilyn), and Fergus M. Ginther (Fergus)—are the only members of Class 6. [Trustee Exhibit No.1, Page 40].

4.    Noble is not only a member of Class 6; he is the proponent of the Plan. Noble signed the Plan before it was filed with this Court. [Trustee Exhibit No.1, Page 39; Main Case Docket No. 394]. Noble is one of the defendants in this Adversary Proceeding. Noble is also a licensed attorney whom this Court finds to be a sophisticated person.

5.    The Plan created a liquidating trust into which assets from the Ginther Trusts were conveyed upon confirmation in order to pay all claims in this case and to make distributions to beneficiaries after these claims are paid. The instrument creating this liquidating trust was attached as Exhibit B to the Plan, and this instrument was entitled "Liquidating Trust

---

[1] Unless otherwise indicated, all docket citations refer to the docket in Adversary No. 06-3556. Hereinafter, the above captioned lawsuit will be referred to as the Adversary Proceeding.

Agreement" (the Liquidating Trust or the Trust). [Trustee Exhibit No. 2; Main Case Docket, No. 394].[2]

6.　　The duly appointed trustee of the Liquidating Trust is Lisa Lee de Montaigu (the Trustee). Ms. de Montaigu, in her capacity as the Trustee of the Liquidating Trust, is the plaintiff in this Adversary Proceeding. The Second Amended Disclosure Statement for the Ginther Plan of Reorganization, which was filed on March 16, 2001 [Main Case Docket No. 386], expressly set forth that Ms. de Montaigu would serve as the Trustee. The first paragraph on page 37 states that "The Proponent contemplates that Lisa de Montaigu will serve as the Liquidating Trustee of the Liquidating Trust." Noble, as the proponent of the Plan, signed this Second Amended Disclosure Statement. At the hearing, Noble acknowledged that he nominated and proposed Ms. de Montaigu as the Trustee. [Transcript of 10/24/06 Hearing, Page 18, Lines 13 - 15].

7.　　Charles E. Long (Long) was the attorney for Noble in this Chapter 11 case. [Transcript of 10/24/06 Hearing, Page 42, Line 22 through Page 43, Line 12]. When Long represented Noble in this case, Long was an attorney at the law firm of Morris, Lendais, Hollrah & Snowden, P.C. (the Firm). On page 39 of the Plan, immediately below Noble's signature, are set forth both the Firm's name and Long's name; and under their names is the representation that they are the attorneys for Noble. [Trustee Exhibit No.1, Page 39]. In addition to Noble, Long and the Firm are the two other defendants in this Adversary Proceeding.[3]

8.　　At some point in time after confirmation of the Plan, both Long and the Firm ceased their representation of Noble. Meanwhile, after the Plan was confirmed and the Trust was created, the Trustee retained Long as her attorney and he served in that capacity through approximately August or September of 2002. [Trustee Exhibit No. 3, Page 2; Transcript of 10/25/06 Hearing, Page 16, Lines 9 - 17; Transcript of 10/24/06 Hearing, Page 46, Lines 4 - 6].

9.　　The Plan's purpose, in part, which is described in the First Amended Disclosure Statement [Main Case Docket No. 372], the Second Amended Disclosure Statement [Main Case Docket No. 386], and is also self evident from a review of the Plan, is to settle several actual and potential claims among the Debtor, the various trusts, and the Minnie Lee Ginther

---

[2]Trustee's Exhibit No. 1 is the Plan and Trustee's Exhibit No. 2 is the Trust. Docket No. 394 in the Main Case reflects that when the Plan was filed with the Clerk's office, the Trust was attached as an Exhibit to the Plan; and, indeed, this Court's review of the file in the Clerk's office reflects that the Trust was attached. However, if one attempts to find Exhibit B to the Plan by using CM/ECF, there will be no Exhibit B; rather, the computer screen will say "The Exhibit[s] may be viewed in the Office of Clerk."

[3]Not surprisingly, both Long and the Firm support the Trustee's request for this Court to issue a preliminary injunction enjoining Noble from asserting causes of action against Long and the Firm belong to the Trust.

Probate Estate by conveying all of the parties' assets to the Liquidating Trust and giving the creditors of all of the parties the right to elect to be beneficiaries of the Trust.  Noble, as the Plan proponent, signed the Plan and both the First Amended Disclosure Statement and the Second Amended Disclosure Statement.  Noble understood all of the terms of the Plan, and he also understood all of the disclosures made in the First Amended Disclosure Statement and the Second Amended Disclosure Statement.

10.  Section 5.2 of the Trust, which is entitled "Powers of Trustee," sets forth, in pertinent part, that the Trustee has the following powers:

> Subject to the provisions of Section Two and of Section 5.4 hereof, in administering the Liquidating Trust, the Trustee shall have the following powers to be exercised in his discretion in the administration of the Liquidating Trust: . . . (ii) to conserve, manage, sell, operate, lease, or otherwise dispose of the Trust Estate for such price and upon such terms and conditions as the Trustee may deem appropriate and to execute such deeds, bills of sale, assignments and other instruments in connection therewith; . . . (v) to collect, receive, compromise and settle notes and other claims and receivables of the Liquidating Trust; (vi) *to assert, prosecute, litigate, compromise and settle claims and causes of action included within the Trust Estate*; . . . and (xv) to exercise such other powers and duties as necessary or appropriate, in the discretion of the Trustee to accomplish the purposes of the Liquidating Trust as set out herein.

[Trustee Exhibit No. 2, Page 6](emphasis added).

11.  Section 5.4.1 of the Trust,  in pertinent part, sets forth the following limitations on the Trustee:

> The Liquidating Trustee must obtain prior approval of a majority of the members of the Trust Advisory Committee to:
>
> > (a) borrow money in excess of $100,000 or grant liens on any part of the Trust Estate in excess of $100,000;
> >
> > (b) sell assets of the Trust Estate with a value in excess of $100,000.;
> >
> > (c) to obtain court approval of modification of the Plan;
> >
> > (d) *initiate and prosecute litigation, including but not limited to claim objections with expected fees and costs in excess of $50,000; and*

4

(e) dispose of or settle any claim or litigation with a potential value to the Liquidating Trust in excess of $50,000.

[Trustee Exhibit No. 2, Page 7] (emphasis added).

12.    Section 5.4.2 of the Trust, which is entitled "Majority Approval," states that:

All actions requiring the approval of the Trust Advisory Committee pursuant to Section 5.4.1 shall conclusively be deemed approved if either (a) the Trustee has submitted a written proposal to the Trust Advisory Committee and has not received an objection thereto within the ten-day period following the submission of such proposal, or (b) a majority of the members of the Trust Advisory Committee approve of such action in writing following the submission of a written proposal by the Trustee. *Any dispute regarding a proposal or the propriety of its approval under this Agreement shall be resolved exclusively by the Bankruptcy Court.*

[Trustee Exhibit No. 2, Pages 7 - 8] (emphasis added).

13.    Section 1.2(m) of the Trust defines the Trust Advisory Committee (the Advisory Committee). [Trustee Exhibit No. 2, Pages 2 - 3]. The Trustee is one member of this Advisory Committee, and the other members are Marilyn, Edmond, Fergus, and Noble. However, Fergus resigned. [Transcript of 10/24/06 Hearing, Page 22, Lines 2 - 3]. Noble also resigned as a member of the Advisory Committee. [Transcript of 10/24/06 Hearing, Page 20, Lines 16 - 20; Page 48, Lines 1 - 15]. Noble then appointed Stuart Douglas Ferrell (Ferrell) as his replacement to sit on the Advisory Committee. [4] [Transcript of 10/24/06 Hearing, Page 20, Lines 16 - 22; Page 90, Lines 17 - 19]. Ferrell is a practicing attorney who has represented Noble for over two decades. [Transcript of 10/24/06 Hearing, Page 17, Line 11 through Page 18, Line 12]. Ferrell is also a close friend and personal confidant of Noble.[5] [Transcript of 10/25/06 Hearing, Page 85, Lines 13 - 22]. Moreover, Noble trusts Ferrell so much that he gave him his power of attorney. [Transcript of 10/24/06 Hearing, Page 62, Line 10-14]. Ferrell is also a close friend of Valorie Davenport (Davenport), the attorney of

---

[4] Unlike Noble, Fergus did not appoint anyone to take his place on the Advisory Committee. Therefore, there were only four members on the Advisory Committee at the time of the July 19, 2005 vote, which is subsequently discussed in this Memorandum Opinion.

[5]According to Ferrell, he is not a mouthpiece for Noble, nor does he obtain Noble's permission when he takes action as a member of the Advisory Committee. Rather, according to Ferrell, his participation as a member of the Advisory Committee is a role entirely independent from his role as attorney, good friend, and personal confidant of Noble. Indeed, according to Ferrell, when fulfilling his duties as a member of the Advisory Committee, his obligations are to the Trust, not Noble. [Transcript of 10/25/06 Hearing, Page 101, Line 18 through Page 102, Line 3].

record for Noble in this Adversary Proceeding; Ferrell and Davenport have been friends for 39 years.  [Transcript of 10/25/06 Hearing, Page 85, Line 23 through Page 86, Line 5].

14.     Section 8.5.1 of the Trust, which is entitled "Indemnification," states that:

> The Liquidating Trust shall indemnify any person who becomes a party, or is threatened to be made a party to any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative by reason of the fact that he is or was a Trustee, employee, or *agent of the Liquidating Trust*, or is or was serving on behalf of the Liquidating Trust at the request of the Trustee as a director, or officer, employee or agent of another corporation, partnership, joint venture, trust, or other enterprise, against expenses (including attorney's fees), judgments, tax obligations, liabilities or penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding, including appeals thereof, if he acted without gross negligence or willful misconduct, in the exercise and performance of any power or duty of a Trustee, employee or agent of the Liquidating Trust, as the case may be, under this Agreement.

[Trustee Exhibit No. 2, Page 15](emphasis added).

15.     Section 6.12(b) of the Plan states that

> The Liquidating Trust shall own all causes of action, including preference claims and avoidance actions previously owned by the Debtor, the Grantor Trusts, the GSTs and the Minnie Ginther Estate, including any causes of action against NationsBank, N.A. and Akin, Gump, Strauss, Hauer & Feld, and shall be authorized to pursue any causes of action for the benefit of the Liquidating Trust.

[Trustee Exhibit No. 1, Page 23].

16.     On February 12, 2003, Noble filed suit in the District Court of Nueces County, Texas against Bank of America, among others.[6]  The cause number was 03-646-G (the Nueces County Suit). [Transcript of 10/24/06 Hearing, Page 49, Line 22 through Page 51, Line 22; Trustee Exhibit No. 17, Exhibits C and D].  Noble filed this suit in his individual capacity.

---

[6]After confirmation of the Plan, Bank of America, N.A. acquired NationsBank of Texas, N.A. Therefore, although Section 6.12(b) of the Plan refers to this financial institution as NationsBank, N.A., the reference is now appropriately to Bank of America, N.A. (the Bank).

17.    On July 21, 2003, the Trustee filed an adversary proceeding in this Court seeking to enjoin Noble from pursuing the Nueces County Suit on the grounds that this suit belonged to the Trustee, not Noble, pursuant to Section 6.12(b) of the Plan. [Adversary Proceeding No. 03-03837, Docket No. 1].

18.    On May 19, 2004, the undersigned judge's predecessor, the Honorable William R. Greendyke, enjoined Noble, among others, from prosecuting the Nueces County Suit on the grounds that this suit belonged to the Liquidating Trust. [Adversary No. 03-03837, Docket No. 41; Trustee Exhibit No. 17, Exhibit C].   Noble appealed this ruling, and on August 24, 2006, the Honorable Vanessa D. Gilmore, United States District Judge, affirmed former Bankruptcy Judge Greendyke's ruling. [Trustee Exhibit No. 17, Exhibit D; Transcript of 10/25/06 Hearing, Page 86, Lines 16-24].

19.    On July 19, 2005, the Trustee, together with her attorney, Richard Battaglia (Battaglia),[7] sent a letter to the three other members of the Advisory Committee. [Trustee Exhibit No. 3]. This letter set forth the conditions under which the Trustee proposed to abandon any claim of the Liquidating Trust against Long for negligence, gross negligence, breach of fiduciary duty, or willful misconduct in Long's capacity as the attorney for the Liquidating Trust. The conditions for abandoning any such claim against Long were expressly set forth in this letter. Set forth below is the verbatim language from the letter discussing these conditions and requesting that the members vote on the proposal:

   (i)    Do you want to abandon any Liquidating Trust claim the Liquidating Trust may have against Charles Long for breach of any duty in his rendition of legal services to the Liquidating Trust under the terms conditions [s]et forth herein above?

   Vote "Yes" or "No"

   (ii)    If you vote "Yes: to the above referenced question (i), do you want to append as a condition or provision to abandonment that prior to the investigation or prosecution of such claim, the prosecuting party shall secure to sole satisfaction of the Advisory Committee a bond from a reputable bonding company rated A+ or better, in an amount equal to the then remaining asset value of the Liquidating Trust?[8]

   Vote "Yes" or "No"

---

[7]Battaglia began representing the Trustee on or about August of 2002. [Transcript of 10/25/06 Hearing, Page 16, Lines 15-17].

[8]Battaglia testified that the amount of the bond would have been a minimum of $800,000. [Transcript of 10/25/06 Hearing, Page 67, Lines 18-22].

(iii)   If you vote "Yes" to question (i), do you want to append as a condition or provision to abandonment that prior to the investigation or prosecution of such claim the prosecuting party shall waive any right to indemnification from the Liquidating Trust?

Vote "Yes" or "No"

[Trustee Exhibit No. 3, Page 4]

20.    On July 19, 2005, the Trustee voted to approve the abandonment of any Liquidating Trust claim against Long if, and only if, the stated conditions were met. The Trustee voted "Yes" on all of these conditions. [Trustee Exhibit No. 4, Page 3; Transcript of 10/25/06 Hearing, Page 65, Line 20 through Page 69, Line 7].

21.    On July 20, 2005, Marilyn voted to approve the abandonment of any Liquidating Trust claim against Long if, and only if, the stated conditions were met. She voted "Yes" on all of these conditions. [Trustee Exhibit No. 4, Page 2; Transcript of 10/25/06 Hearing, Page 65, Line 20 through Page 69, Line 7].

22.    On July 21, 2005, Edmond voted to approve the abandonment of any Liquidating Trust claim against Long if, and only if, the stated conditions were met. He voted "Yes" on all of these conditions. [Trustee Exhibit No. 4, Page 1; Transcript of 10/25/06 Hearing, Page 65, Line 20 through Page 69, Line 7].

23.    On July 28, 2005, Ferrell sent a letter to Battaglia responding to the Trustee's Letter of July 19, 2005. [Trustee Exhibit No. 5]. In this letter, Ferrell expressed the following views: (1) that the Liquidating Trust would not have to indemnify Long if a suit were brought against him; and (2) there would be no need for any party suing Long to put up a bond or any other security for the benefit of the Trust. [Transcript of 10/25/06 Hearing, Page 102, Lines 8 - 23]. In this letter, Ferrell also set forth that the Trust should abandon any claim against Long to allow any beneficiary to bring an action against Long and that no conditions should be tied to the abandonment of the claim. [Transcript of 10/25/06 Hearing, Page 15, Lines 4 - 22; Page 90, Lines 19 - 25; Page 110, Line 11 through Page 112, Line 19].

24.    Thus, as a result of the votes of the four members of the Advisory Committee, three of the four members—i.e. a majority of the members of the Advisory Committee—approved the abandonment of any claim held by the Trust against Long if, and only if, all of the stated conditions set forth in the Trustee's Letter of July 19, 2005 were satisfied. Ferrell was the only member who voted against abandonment under these conditions. [Transcript of

10/25/06 Hearing, Page 110, Line 11 through Page 112, Line 19]. The Court finds that this vote was a valid vote under Section 5.4.2 of the Trust.[9]

25.    After the vote on the Trustee's proposal was taken, Battaglia, in various conversations with Ferrell and Davenport, informed them of the results of the vote. [Transcript of 10/25/06 Hearing, Page 41, Line 5 through Page 42, Line 3]. Thus, Ferrell and Davenport knew that the Trust had not abandoned any claims that the Trust had against Long unless the specified conditions precedent were met; as the attorneys for Noble, their knowledge of this fact is imputed to Noble. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 584 (Tex. 2006) (stating that "in the context of an enduring attorney-client relationship, knowledge acquired by the attorney is imputed to the client.") (citation omitted); *see also Burke v. Ins. Auto Auctions Corp.*, 169 S.W.3d 771, 777-78 (Tex. App.—Dallas 2005, pet. denied) (citing *Lehrer v. Zwernemann*, 14 S.W.3d 775, 778 (Tex. App.—Houston [1st. Dist.] 2000, pet. denied).

26.    On June 8, 2006, despite having actual or constructive knowledge that the Trust had expressly conditioned abandonment of any claims against Long belonging to the Trust, Noble—through Davenport as his attorney of record on the pleadings—nevertheless filed an Original Petition, without meeting those conditions, against Long and the Firm in the District Court of Harris County, Texas, 157th Judicial District. This suit is styled as follows: *Noble C. Ginther, Jr., Individually and as Beneficiary and Representative of the Ginther Liquidating Trust and of the Estate of Noble Ginther, Sr. vs. Charles E. Long, Individually and on Behalf of Morris, Lendais, Hollrah, & Snowden, a Professional Corporation*, Cause No. 2006-35759 (the State Court Suit). [Trustee Exhibit No. 17].[10] In his Original Petition,

_____

[9]Noble testified that the Trustee does not have the right to vote unless there is a tie vote among the other members of the Advisory Committee. [Transcript of 10/24/06 Hearing, Page 21, Line 23 through Page 22, Line 16]. Contrary to what Noble believes, the Court finds that the Trustee is a voting member of the Advisory Committee. Section 5.4.2 of the Trust expressly states that "All actions requiring approval of the Trust Advisory Committee pursuant to Section 5.4.1 shall conclusively be deemed approved if . . . a majority of the members of the Trust Advisory Committee approve of such action in writing following the submission of a written proposal by the Trustee." [FOF No. 12]. Section 1.2(m) of the Trust expressly sets forth that the Advisory Committee shall include the Liquidating Trustee. [FOF No. 13]. Accordingly, there is no doubt that the Trustee is a full voting member. It is worth noting, however, that even if the Trustee is not a voting member—such that her vote on July 19, 2005 did not count—there would still be a majority of the members voting to approve the abandonment of any claim held by the Liquidating Trust against Long if, and only if, all of the stated conditions in the proposal were satisfied. Marilyn and Edmond voted in the affirmative, and Ferrell voted in the negative. Thus, even if Noble is correct that the Trustee does not have the right to vote unless there is a tie vote, 66 2/3% of the votes would have been in favor of the proposal. There is no question that 66 2/3% would have constituted a majority required by Section 5.4.2 of the Trust.

[10]Trustee Exhibit No. 17 is a copy of the Complaint that the Trustee filed in this Court to initiate the Adversary Proceeding. Noble's Original Petition in the State Court Suit is attached as Exhibit "A" to the Complaint.

Noble asserts causes of action which belong to the Liquidating Trust, not to Noble individually. Specifically, the Original Petition seeks recovery, at least in part, against Long and the Law Firm for legal services that were rendered to the Liquidating Trust. [Docket No. 1, Ex. B, ¶¶ 6 and 10].

27.    Noble and his attorneys deliberately chose to disregard Section 5.4.2 of the Trust and the results of the vote. Rather, they filed the State Court Suit without Noble posting a bond. [Transcript of 10/25/06 Hearing, Page 104, Line 21 through Page 105, Line 2]. Neither Noble nor Ferrell nor Davenport filed any pleadings in this Court concerning the Trustee's proposal regarding the conditions for abandoning any cause of action or regarding the propriety of the July 2005 approval of this proposal.

28.    On August 1, 2006, the Trustee and her attorney, Battaglia, sent a letter to the other members of the Advisory Committee—and also to Fergus—discussing Noble's filing of the State Court Suit.   The letter reminded the members that the Trust never abandoned any claims against Long because the specific conditions tied to the abandonment never occurred.   The letter then requested the members of the Advisory Committee to vote to authorize the Trustee to take action against Noble to stop him from asserting any claims against Long and the Law Firm that belong to the Trust. [Trustee Exhibit No. 6].

29.    On August 1, 2006, the Trustee cast her vote in favor of taking action to enjoin Noble. [Trustee Exhibit No. 7, Page 1].

30.    On August 2, 2006, Edmond and Marilyn voted in favor of taking action to enjoin Noble. [Trustee Exhibit No. 7, Page 2].[11]

31.    On August 3, 2006, Ferrell sent a hand-written telefax to the Trustee and Battaglia objecting to the vote being taken. [Trustee Exhibit No. 8].

32.    Thus, as a result of the votes of the four members of the Advisory Committee, three of the four members—i.e. a majority of the members of the Advisory Committee—approved the Trustee taking action to enjoin Noble from prosecuting any causes of action in the State Court Suit against Long and the Firm that belong to the Liquidating Trust.[12]

------

[11] Marilyn's signature is actually dated October 2, 2006.  It appears that this was an oversight on her part, and that she signed her vote on August 2, 2006.  [See Transcript of 10/25/06 Hearing, Page 11 Line 5 through Page 14, Line 6].  Even if this Court is incorrect and Marilyn in fact signed her vote on October 2, 2006, this Court's analysis and ruling would not change.

[12] Once again, even if Noble is correct that the Trustee may not vote unless there is a tie vote, Marilyn and Edmond voted in the affirmative, and only Ferrell voted in the negative.  Thus, 66 2/3% of the votes were in favor of the Trustee's proposal to take action to enjoin Noble. Accordingly, this Court finds that the vote is valid and enforceable under Section 5.4.2 of the Trust. [See also Footnote No. 9].

33. On September 8, 2006, the Trustee initiated this Adversary Proceeding by filing a pleading in this Court against Noble, Long, and the Firm entitled "Complaint for Declaratory Judgment, and Request for Preliminary and Permanent Injunction." (the Complaint) [Adversary Proceeding Docket No. 1 and Trustee Exhibit No. 17]. The Complaint seeks an injunction against Noble from prosecuting any causes of action against Long and the Firm that belong to the Liquidating Trust. The Complaint also seeks to enjoin Long and the Firm from prosecuting or litigating claims against the Trust under the indemnification provision set forth in the Liquidating Trust; the Trustee is worried about the amount of fees and expenses that the Trust will have to pay to Long and the Firm for defending themselves. [Transcript of 10/25/06 Hearing, Page 42, Line 20 through Page 43, Line 5; Page 44, Line 8 through Page 45, Line 22; Page 46, Line 20 through Page 49, Line 5]. Indeed, The Trust presently has no liquidity. [Transcript of 10/25/06 Hearing, Page 49, Lines 3-5].

34. On September 29, 2006, Long filed an Answer to the Complaint, a cross-claim against the Trustee, and a counter-claim against Noble. [Adversary Proceeding Docket No. 21] [Trustee Exhibit No. 9]. In the cross-claim against the Trustee, Long seeks indemnification for the attorney's fees and expenses that he will incur in defending himself against the claims brought by Noble in the State Court Suit.

35. On October 3, 2006, a hearing was held on the Trustee's request for a Preliminary Injunction. This hearing was continued.

36. On October 11, 2006, the Firm filed an Answer to the Complaint and also filed a counter-claim against Noble. [Adversary Proceeding Docket No. 26] [Trustee Exhibit No. 10]. In its answer, the Firm seeks indemnification from the Trustee for the attorney's fees and expenses that the Firm will incur in defending itself against the claims brought by Noble.

37. On October 12, 2006, Noble filed an Answer to the Complaint. [Adversary Proceeding Docket No. 25].

38. On October 24, 2006, a continuation of the hearing on the request for the Preliminary Injunction was held. Noble and Ferrell gave testimony at this hearing, which was continued until the following day.

39. On October 25, 2006, a continuation of the hearing on the request for the Preliminary Injunction was held. Ferrell and Battaglia testified at this hearing, which was continued until the following day.

40. On October 26, 2006, this Court made oral findings of fact and conclusions of law on the record in open court and granted the Preliminary Injunction.

## III.
## CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

1.  This Court has jurisdiction over the Adversary Proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b). This suit is a core proceeding. Alternatively, if it is not a core proceeding, it is a related to proceeding.[13]

2.  Venue is proper pursuant to 28 U.S.C. § 1409.

### B. The Four Elements Necessary for Obtaining a Preliminary Injunction

3.  To obtain a preliminary injunction, the Trustee must establish that: (a) there is a substantial likelihood that she will prevail on the merits; (2) there is a substantial threat that irreparable harm to the Trust will result if the injunction is not granted; (3) the threatened injury to the Trust outweighs the threatened harm to Noble; and (4) a preliminary injunction will not disserve the public interest. *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 572-73 (5th Cir. 1974) (en banc); *Clark v. Prichard*, 812 F. 2d 991, 993 (5th Cir. 1987). All four elements are mixed questions of law and fact. *Kern River Gas Transmission v. Coastal Corp.*, 899 F. 2d 1458, 1462 (5th Cir. 1990).

#### a.   The first element: Substantial likelihood that the Trustee will prevail on the merits

4.  This Court concludes that there is a substantial likelihood that the Trustee will prevail on the merits for several reasons. First, section 5.4.2 of the Trust expressly states that any dispute regarding a proposal made by the Trustee, or the propriety of the approval of the proposal, shall be resolved exclusively in this Bankruptcy Court. [FOF No. 12]. Here, the Trustee made a proposal to the Advisory Committee as to what conditions should be met in order for the Trust to abandon any claim that it might have against Long [FOF No. 19], and a majority of the Advisory Committee's members voted in favor of this proposal [FOF Nos. 20, 21, 22, and 24]. Thus, the vote was properly taken pursuant to the Trust, and Noble is bound by this vote.[14] To the extent that the State Court Suit seeks to prosecute causes of action against

---

[13]This Court's jurisdiction is discussed at length below in subsection C.

[14]It is worth noting how brazen Noble is with respect to disregarding the terms of the Plan and Trust for which he was the proponent. During the hearing, he testified twice that he is not bound by the vote of the Advisory Committee. [Transcript of 10/24/06 Hearing, Page 41, Lines 7 - 8; Page 67, Line 23 through Page 68, Line 16]. For his part, Ferrell, who, as Noble's attorney, is Noble's agent, *Augustson v. Linea Aerea Nacional-Chile, S.A.*, 76 F.3d 658, 665 (5th Cir. 1996), also testified that Noble is not bound by the vote.

Long that belong to the Trust—and it most certainly does—Noble's filing of this suit is a direct violation of the terms of the Plan and the Trust. The Advisory Committee voted to abandon such causes of action to beneficiaries like Noble if, and only if, the beneficiary would post a bond and waive any right to indemnification from the Trust. Noble has not satisfied either of these conditions.

5.      Second, even assuming that the vote was somehow improper, Noble is required to come to this Court, not the Harris County District Court or some other forum, to resolve the dispute. At the preliminary injunction hearing, Noble's counsel, Davenport, seemed to suggest that the vote was improper or invalid because the Trustee did not give Noble written notice of the results of the vote.[15] [Transcript of 10/25/06 Hearing, Page 222, Line 5 through Page 223, Line 4]. This Court found no provision in the Plan or the Trust requiring the Trustee to give any member of the Advisory Committee written notice of the results of any vote, and therefore the Court rejects counsel's argument.[16] However, even if this argument has merit, thereby casting doubt on the propriety of the vote, Noble still is required to come to this Court to resolve any challenge that he might want to make about the vote. This, he has failed to do.

6.      Third, Noble himself is the proponent of the Plan. [FOF No. 4]. It was Noble who proposed the Plan that established the Trust that requires Advisory Committee members to come to this Court to resolve disputes over proposals of the Trustee or the propriety of the votes over those proposals. [FOF Nos. 4, 5, and 12]. Yet, in this instance, when Noble decided that he did not like the proposal due to the specific conditions that needed to be met for abandonment to take place [FOF No. 19], he thumbed his nose at his own Plan and the Trust established thereunder and unilaterally filed causes of action against Long and the Firm which belong to the Trust. [FOF No. 26]. The Plan, and the Trust which the Plan created, is a contract between the reorganized debtor and the classes described in the Plan. *In re Berryman Prod., Inc.*, 183 B.R. 463, 467 (N.D. Tex. 1995). As such, the Plan is subject to contract analysis. *See, e.g., Id.; In re Hoffinger Indus., Inc.*, 321 B.R. 498, 511 (Bankr. E.D. Ark. 2005) (analyzing the meaning of plan provisions in contract terms); *In re Coram*

---

[Transcript of 10/24/06 Hearing, Page 92, Line 13 through Page 94, Line 15].

[15]Ferrell testified to this effect, too. [Transcript of 10/25/06 Hearing, Page 107, Lines 1-9].

[16]At the hearing, Ferrell testified about Section 10.3 of the Trust and suggested that the Trustee was required to give written notice of any Advisory Committee vote to each of the members and that failure to do so meant that no one was bound by the vote. [Transcript of 10/25/06 Hearing, Page 109, Lines 12-19]. The Court disagrees with this interpretation of Section 10.3. This section simply states that any notices to Advisory Committee members must be sent in writing to such addresses as each member gives by written notice to the Trustee. There is no express requirement that the Trustee give written notice of the results of any vote taken by the Advisory Committee. Indeed, there is no requirement that the Trustee even give verbal notice, although Battaglia gave verbal notice to Ferrell and Davenport about the results of the vote, and he did so prior to Davenport's filing the State Court Suit on behalf of Noble. [FOF Nos. 25, 26].

*Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) (discussing the binding nature of the plan on those who vote for it in terms of contract acceptance); *In re Hunter*, 144 B.R. 871, 874 (Bankr. D. S.D. 1992) ("A Plan is a contract consisting of a novation of the previous agreements between the parties."). Noble's prosecuting causes of action against Long and the Firm that belong to the Trustee is a blatant breach of the Plan and the Trust created thereunder. Noble's breach of the Plan contract leads this Court to conclude that there is a substantial likelihood that the Trustee will prevail on the merits.

7. Moreover, Noble's usurpation of the Trustee's claims against Long is barred by the doctrine of res judicata. Noble's counsel argued that under state law, Noble has the right to bring any claims of the Trust against Long if the Trustee refuses to do so. [Transcript of 10/25/06 Hearing, Page 87, Line 7 through Page 90, Line 10]. This argument flies directly in the face of the Fifth Circuit's holding in *Republic Supply Co. v. Shoaf*, 815 F. 2d 1046 (5th Cir. 1987). There, the Fifth Circuit held that any creditor or party-in-interest who has proper notice of the proposed plan and has participated in the plan confirmation process is bound by all of the terms of the plan that is actually confirmed. *Id.* at 1049. Here, there is no question that Noble was on notice of the Plan and participated in the process of confirming the Plan; indeed, as the proponent of the Plan, he was the captain of the Plan confirmation ship. [FOF Nos. 4, 6, and 9]. The Plan expressly creates the Trust, which is attached to the Plan and is the key vehicle used as the means for executing and implementing the Plan and accomplishing the purposes of the Plan. [FOF Nos. 5, 6, and 9]. Section 5.4.2 of the Trust expressly requires Noble to come to this Court to resolve any dispute over any proposal made by the Trustee or any dispute over the propriety of any vote taken on any proposal made by the Trustee.[17] Under *Shoaf*, Noble is bound by this provision, and he cannot rely upon state law to circumvent this provision. Indeed, Section 12.4 of the Plan and Section 10.10 of the Trust, while both setting forth that the laws of the State of Texas govern the documents, expressly provide that state law does *not* govern to the extent that bankruptcy law and federal law govern. Here, the holding of the Fifth Circuit in *Shoaf*, which is clearly a holding involving federal bankruptcy law, trumps any Texas law that might allow Noble to file a suit that the Trustee will not pursue.

8. Finally, to allow Noble to pursue causes of action against Long that belong to the Trustee would violate 11 U.S.C. § 1127(b). This section prohibits modification of a confirmed plan if substantial consummation has occurred. A plan is substantially consummated when: (1)

---

[17]Section 5.4.2 of the Trust is silent as to whether only a member of the Advisory Committee may bring to this Court any dispute regarding a proposal, or the propriety of its approval, or whether a non-member/beneficiary (such as Noble) may also do so. Because the Trust is silent on this point, this Court finds that non-members who are nevertheless beneficiaries have standing to prosecute any dispute in this Court. Moreover, it is by no means clear to this Court that Noble may not still be considered a member of the Advisory Committee. Even if it is concluded that Ferrell is a member and Noble is not, Ferrell, standing in Noble's shoes as his replacement, would therefore be bound by the Section 5.4.2 of the Trust, and would be obligated to bring any disputes regarding the Trustee's proposal to this Court.

all or substantially all of the property proposed to be transferred by the plan is transferred; (2) the debtor or debtor's successor assumes all or substantially all of the property dealt with by the plan; and (3) distribution under the plan has commenced. 11 U.S.C. § 1101(2). A bankruptcy court determines on a case by case basis whether a plan is substantially consummated. *In re U.S. Brass Corp.*, 255 B.R. 189, 193 (E.D. Tex. 2000) (citing *In re Stevenson*, 148 B.R. 592, 596 (D. Idaho 1992)). In *U.S. Brass*, the plan was found to be substantially consummated because secured claims were paid and payments to unsecured creditors had commenced. *Id.* Here, there is no question that the Plan has been substantially consummated.[18] Because the Plan has been substantially consummated, no modification may be made–and there can be no doubt that allowing Noble to sue Long over claims that belong to the Trustee would modify both Section 5.2 and Section 5.4.2 of the Trust. Under Section 5.2, only the Trustee may bring suits that belong to the Trust; and under Section 5.4.2, if Noble is unhappy with the proposal of the Trustee over what conditions must be met for any abandonment of claims against Long, or with the propriety of the vote on this proposal, he must come to this Court, not some other court, to resolve the dispute. [FOF No. 12].

9.    Nor can Noble argue that allowing him to sue Long on claims belonging to the Trust is not a modification because such a change is immaterial. *See Hollywood Fantasy Corp. v. Gabor*, 151 F. 3d 203, 208 (5th Cir. 1998) ("Texas cases finding modifications not material generally involve changes that do not significantly alter the obligations or exposures under a contract."). Here, allowing Noble to pursue Long and the Firm significantly exposes the Trust because Long and the Firm have filed claims against the Trustee for indemnification [FOF Nos. 34 and 36] pursuant to Section 8.5.1 of the Trust [FOF No 14]. The Trust does not have sufficient funds to pay substantial attorneys' fees to Long and the Firm for defending themselves against Noble. [Transcript of 10/25/06 Hearing, Page 49, Lines 3-5; Page 42, Line 20 through Page 43, Line 5; Transcript of 10/25/06 Hearing, Page 67, Line 3 through Page 68, Line 11].

10.   For all of these reasons, this Court concludes that there is a substantial likelihood that the Trustee will prevail on the merits of her Complaint in this Adversary Proceeding.

**b.    The second element: Substantial threat that irreparable harm to the Trust will result if the injunction is not granted**

11.   This Court also finds that there is a substantial threat that irreparable harm to the Trust will result if the preliminary injunction is not granted. As noted above, Long and the Firm are

---

[18]In a Memorandum Opinion that this Court issued on July 21, 2005 in Adversary Proceeding No. 04-3944, a suit where the Trustee was the plaintiff and Noble was one of the defendants, this Court made an express finding of fact that as of June 5, 2002, most of the distributions under the Plan had been made except for those distributions to Classes 6 and 7. This Court also made an express conclusion of law that the Plan was substantially consummated. [Adversary No. 04-3944, Docket No. 93]. These findings and conclusions are incorporated here. *See EEOC v. Datapoint Corp.*, 457 F.Supp. 62, 68-69 (W.D. Tex. 1978).

15

seeking indemnification from the Trust for the attorneys' fees and costs that they are incurring for defending themselves against the claims that Noble has brought against them. In such litigation, these fees and costs can escalate quickly, so much so that the remaining assets in the Trust could be completely exhausted reimbursing Long and the Firm for their fees and expenses. [FOF No. 33]. Under this scenario, the Trust would be left with nothing and the remaining distributions contemplated under the Plan to Class 6 members would never occur. Although Noble is a member of Class 6 and may not care whether the remaining funds in the Trust are drained, there are other members of Class 6 to whom the Trustee owes a duty to ensure that these remaining funds are distributed to them under the provisions of the Plan.   It is the loss of these monies that constitutes the irreparable harm to the Trust.[19]

### c.    The third element: The threatened injury to the Trust outweighs the threatened harm to Noble

12.    Next, this Court concludes that the threatened injury to the Trust if the injunction is not granted outweighs the threatened harm to Noble if the injunction is granted. As noted above, the threatened injury to the Trust is that all of its remaining assets will be used up reimbursing Long and the Firm for the fees and costs that they incur in defending against the claims that Noble has brought against them that belong to the Trust.  On the other hand, this Court is unable to discern what injury Noble will suffer if the injunction is imposed. An injunction will not prohibit him from suing Long and the Firm on any causes of action that Noble, in his individual capacity, has against them. An injunction will simply stop him from prosecuting claims that belong not to him, but to the Trustee. Moreover, an injunction will not stop him from coming to this Court to lodge any complaint regarding the Trustees's proposal about the conditions for abandoning the Trust's claims against Long or about the propriety of the vote in July of 2005 on this proposal. Under the very terms of the Plan and Trust of which he was the proponent, Noble has the right to bring such a dispute to this Court. In sum, this Court sees no injury that can befall Noble if this Court grants an injunction. He has known all along that Section 5.4.2 of the Trust requires him to come to this Court, and making him adhere to this provision cannot be said to be an injury to him.

### d.    The fourth element: A preliminary injunction will not disserve the public interest

13.    With respect to the last element—granting of the preliminary injunction will not disserve the public interest—this Court believes that imposing an injunction in this instance will in fact promote the public interest. The public needs to know that a bankruptcy court will enforce the terms of the plan that it has confirmed and will not allow modifications after the plan has

---

[19] Indeed, it is the potential loss of these monies from the Trust that led the Trustee to propose that if any claim against Long is to be abandoned, the beneficiary taking over prosecution of any suit against Long and the Firm, must post bond and agree not to seek indemnification from the Trust.

been confirmed and substantial consummation has occurred. For this Court to do otherwise would undermine the need for finality in the legal system in particular and the entire bankruptcy process in general, including all of the negotiations that took place culminating in the confirmation of the Plan.

14.     For all of the reasons set forth above, this Court concludes that the Trustee has satisfied all four elements necessary to obtain a preliminary injunction.

C.     This Court has subject matter jurisdiction over the Adversary Proceeding

15.     This Court believes that it is appropriate to set forth its conclusions of law regarding its jurisdiction over this dispute because Noble's counsel, prior to testimony being adduced from witnesses, argued that this Court does not have subject matter jurisdiction over the Adversary Proceeding. [Transcript of 10/24/06 Hearing, Page 13, Line 5 through Page 14, Line 11; Docket No. 25, Pages 6 - 7, ¶¶ 30-32].

16.     As a starting point, there is no question that analysis of a bankruptcy court's subject matter jurisdiction over post-confirmation suits must begin with 28 U.S.C. § 1334(b). *U.S. Brass*, 301 F.3d at 303-304; *In re Coho Energy, Inc.*, 309 B.R. 217, 220 (Bankr. N.D. Tex. 2004). 28 U.S.C. § 1334(b) defines jurisdiction conjunctively as either "arising under," "arising in," or "related to" a case under Title 11. Therefore, jurisdiction certainly exists if the post-confirmation pending lawsuit is at least related to the Chapter 11 case. *U.S. Brass*, 301 F.3d at 304 ("[I]t is necessary only to determine whether a matter is at least 'related to' the bankruptcy."). Because 28 U.S.C. § 1334 does not expressly limit bankruptcy court jurisdiction upon plan confirmation, *Id.*, it is necessary to look to case law to determine the extent of such jurisdiction. In *In re Majestic Energy Corp.*, 835 F.2d 87 (5th Cir. 1988), which concerned a pre-confirmation filed suit, the Fifth Circuit used the extremely broad definition of "related to" set forth in *In re Wood*, 825 F.2d 90 (5th Cir. 1987) in analyzing whether the suit came within the jurisdictional grant of 28 U.S.C. § 1334(b).[20] Now, in analyzing whether a suit filed post-confirmation comes within 28 U.S.C. § 1334(b), the question is whether the same expansive *Wood* definition of "related to" used in *Majestic Energy* for pre-confirmation filed suits also applies to post-confirmation filed suits?[21]

---

[20] In *Wood*, the Fifth Circuit set forth that a suit is a "related to" proceeding under 28 U.S.C. § 1334(b) if the outcome of the proceeding "could *conceivably* have any effect on the estate being administered in bankruptcy." *Wood*, 825 F.2d at 93 (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original).

[21] In *Bankruptcy Trading & Investments v. Chiron Financial Group, Inc.*, 342 B.R. 474 (S.D. Tex. 2006), which involved a suit filed post-confirmation, the District Court stated, "Use of the 'related to' test for 28 U.S.C. § 1334 jurisdiction is not appropriate, however, because [the debtor's] bankruptcy reorganization plan has been confirmed." *Id.* at 478. This Court, with utmost respect for the District Court, disagrees with this statement. 28 U.S.C. § 1334(b) does not itself expressly limit bankruptcy court jurisdiction in post-confirmation pending suits. Accordingly, the "related to" analysis still needs to be done.

17

17.     In the Fifth Circuit, the answer is resoundingly in the negative. The watershed case is *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388 (5th Cir. 2001). There, 18 months after a plan was confirmed, the reorganized debtor sued a bank asserting state law claims. The debtor argued that the bankruptcy court had "related to" jurisdiction under 28 U.S.C. § 1334(b) because, using the *Wood* definition of "related to," the outcome of the suit "could conceivably have an effect on the debtor's estate." *Id.* at 390.

18.     In ruling against the debtor, the Fifth Circuit expressly rejected use of the *Wood* definition of "related to" for analyzing whether a bankruptcy court has jurisdiction of a suit filed post-confirmation. The Fifth Circuit stated that:

> Some circuits have utilized this theory [i.e. the expansive definition of "related to" used in *Wood*], which originated to describe the scope of bankruptcy jurisdiction during the pendency of the case, to assess jurisdiction after confirmation of a reorganization plan, but they have not applied it on post-confirmation facts like those before us. [citations omitted]
>
> The more persuasive theory of post-confirmation jurisdiction, however, attached critical significance to the debtor's emergence from bankruptcy protection. As the Seventh Circuit put it,

> > Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens.

> [citations omitted] *After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.* [citations omitted] No longer is expansive bankruptcy court jurisdiction required to facilitate "administration" of the debtor's estate, for there is no estate left to reorganize. This theory has antecedents in our court's jurisprudence, which has observed that the reorganization provisions of the former Bankruptcy Act "envisage[ ] that out of the proceedings will come a newly reorganized company capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court."

---

The key inquiry is whether the scope of the phrase "related to" is different for post-confirmation suits than it is for pre-confirmation suits. The factors discussed in *Craig's Stores* relevant to post-confirmation jurisdiction are merely a different means to get to the same end of "related to" under 28 U.S.C. § 1334(b). The fact that confirmation of a plan has occurred does not eliminate the statutory "related to" requirement; it simply alters the analysis, at least in the Fifth Circuit.

[citations omitted]   Because it comports more closely with the effect of a successful reorganization under the Bankruptcy Code than the expansive jurisdiction cases, we adopt this more exacting theory of post-confirmation bankruptcy jurisdiction. (emphasis added)

*Craig's Stores,* 266 F.3d at 390-391.

19.   The italicized language above is the Fifth Circuit's definition of "related to" for suits filed post-confirmation.  If the suit concerns "matters pertaining to the implementation or execution of the confirmed plan," then the suit is "related to" and the bankruptcy court has jurisdiction over the suit; otherwise, the court does not.

20.   In *Craig's Stores*, the Fifth Circuit held that the bankruptcy court did not have jurisdiction because the facts reflected that the suit in no way pertained to the implementation or execution of the Plan.  The Fifth Circuit focused on three factors in arriving at this conclusion.  First, the court noted that the debtor's claim dealt with post-confirmation relations between the debtor and the bank.  *Id.* at 391. Second, the court noted that there was no antagonism or claim pending between the parties as of the date of the reorganization (i.e. the date of the confirmation of the plan).  *Id.*  Finally, the court noted that the causes of action asserted by the debtor did not bear on the interpretation or execution of the confirmed plan. *Id.*

21.   In *U.S. Brass*, the Fifth Circuit once again examined whether a suit filed post-confirmation came within the jurisdiction of the bankruptcy court.  Applying the more exacting *Craig's Stores* test for jurisdiction over suits filed post-confirmation, the Fifth Circuit held that the bankruptcy court did have jurisdiction because:

> the [parties opposing jurisdiction] rely on the Bankruptcy Code's prohibition on the modification of a substantially consummated plan of reorganization. The [debtor and other parties supporting jurisdiction] contend, on the other hand, that their proposed agreement—including the arbitration provision—is fully consistent with the plan.  Bankruptcy law will ultimately determine this dispute and the outcome could affect the parties' post-confirmation rights and responsibilities.   Furthermore, this proceeding will certainly impact compliance with or completion of the reorganization plan.

*U.S. Brass,* 301 F.3rd at 305.

22.   Noble's attorney argued that the holding in *Craig's Stores*, when applied to the facts in this Adversary Proceeding, leads to the conclusion that this Court does not have subject matter jurisdiction. [Transcript of 10/24/06 Hearing, Page 13, Lines 5 - 14]. This Court disagrees.

23.     In *In re Encompass Services Corp.*, 337 B.R. 864 (Bankr. S.D. Tex. 2006), this Court reviewed six pertinent factors, based on the Fifth Circuit's decisions in *Craig's Stores* and *U.S. Brass,* and the case law applying those holdings,[22] that are relevant to the inquiry of subject matter jurisdiction over post-confirmation suits.  These factors are as follows:

(1) what provisions in the confirmed plan exist for resolving disputes and whether there are provisions in the plan retaining jurisdiction for trying suits; (2) the nature of the parties involved; (3) whether state law or bankruptcy law applies; (4) indices of forum shopping.(5) when the claim at issue arose; and (6) whether the plan has been substantially consummated.

24.     The Court finds that it does have jurisdiction over this post-confirmation Adversary Proceeding.  Applying these six factors to the instant Adversary Proceeding produces the following conclusions:

a.      **Factor No. 1:  Provisions in the confirmed plan**

Under this first factor, the Court considers whether (i) there is a retention of jurisdiction provision in the plan, (ii) other language in the Plan that relates to the bankruptcy court's jurisdiction, and (iii) the facts and law arising from the Plan favor retention of jurisdiction by the bankruptcy court. *Encompass*, 337 B.R. at 874-875.

The Plan specifically provides for this Court's retention of jurisdiction after confirmation of the Plan. [Trustee Exhibit No. 1, Pages 32 - 35].  Some courts emphasize the importance of having a jurisdiction-retention provision in the plan when considering a bankruptcy court's post-confirmation jurisdiction. *See Enron Corp. v. Credit Suisse First Boston, Inc. (In re Enron Corp. Sec. & ERISA Litig.)*, No. G-05-0012, H-01-3624, 2005 WL 1745471, at *5 (S.D. Tex. July 25, 2005) (noting that "[t]he Second Circuit is among courts that require such a jurisdiction retention clause be included in the plan as a prerequisite for post-confirmation assertion of jurisdiction by the bankruptcy court." (citations omitted)).  The Fifth Circuit, however, has made clear that jurisdiction-retention provisions are not controlling. *See U.S. Brass*, 301 F.3d at 303 ("[T]he source of the bankruptcy court's subject matter jurisdiction is neither the Bankruptcy Code nor the express terms of the Plan.  The source of the bankruptcy court's jurisdiction is 28 U.S.C. §§ 1334 and 157.") (quoting *United States Tr. v. Gryphon at the Stone Mansion, Inc.*, 216 B.R. 764, 769 (W.D. Pa. 1997), aff'd, 166 F.3d 552 (3d Cir. 1999)).  While this Court acknowledges that the retention of jurisdiction provision in the Plan does not create jurisdiction, the presence of the provision at least ensures that jurisdiction cannot be lacking based on an absence of the provision. *See Coho Energy*, 309 B.R. at 219 n.4 (Bankr. N.D. Tex. 2004) ("[A] plan which fails to retain subject matter jurisdiction may leave it lacking, but a plan cannot create jurisdiction where it does not otherwise exist.").

---

[22] *See Coho Energy,* 309 B.R. at 220-221, in which the Honorable Barbara J. Houser, United States Bankruptcy for the Northern District of Texas, provides an excellent synthesis of the holdings in *U.S. Brass* and *Craig's Stores*.

Here, Article 11 of the Plan expressly states, in pertinent part, that:

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Reorganization Case after the Effective Date as is legally permissible, including, without limitation, jurisdiction to:

4. Ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan; . . .

6. Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement; . . .

8. Resolve any and all controversies, suits or issues that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan, including the provisions of Article 9; . . .

10. Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan; . . .

12. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement. . .

[Trustee Exhibit No. 1, Pages 33-34].

Any one of these five separate and distinct paragraphs from Article 11 of the Plan applies to this Adversary Proceeding. With respect to paragraph 4, the Trustee is seeking to enjoin Noble from suing Long and the Firm in order to preserve the remaining assets in the Trust so that distributions to Class 6 can be made pursuant to the provisions of the Plan. With respect to paragraph 6, the Trustee is seeking to enjoin Noble from suing Long and the Firm in order to implement the provisions of not only the Plan, but Section 5.4.2 of the Trust that is integral to the Plan. With respect to paragraph 8, the Trustee is seeking to enjoin Noble from suing Long and the Firm because the State Court Suit creates a controversy that arises in connection with the interpretation and the enforcement of not only the Plan, but Section 5.4.2 of the Trust created by Article 9 of the Plan. With respect to paragraph 10, the Trustee initiated this Adversary Proceeding requesting this Court

to issue an injunction in order to restrain Noble from interfering with the Plan. Finally, with respect to paragraph 12, the Trustee filed the Complaint against Noble because the relief which the Trustee seeks concerns a matter—i.e. Noble's attempt to usurp powers conferred upon the Trustee by the Plan and the Trust—pertaining to the implementation and execution of the Plan and the Trust. *Craig's Stores*, 266 F.3d at 390-391 ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation and execution of the Plan.").

All in all, because the Plan provides specific jurisdiction retention provisions that apply to this particular Adversary Proceeding, Noble may not argue that this Court lacks jurisdiction due to deficient language in the Plan.

The Adversary Proceeding directly pertains to the implementation of the Plan. Section 6.12 of the Plan—which, once again, this Court wishes to emphasize was put forth by Noble as the proponent—states that "On the Effective Date, each member of the Ginther Family and each holder of each Claim will be deemed to have ratified and become bound by the terms of the Liquidating Trust Agreement." [Trustee Exhibit No. 1, Page 23]. Further, Section 6.12(a) of the Plan expressly states that "The Liquidating Trustee shall have the powers, duties and obligations specified in this Plan and the Liquidating Trust Agreement." *Id*. Moreover, Section 6.12(b) of the Plan states that "The Liquidating Trust shall own all causes of action. . . and shall be authorized to pursue any causes of action for the benefit of the Liquidating Trust." *Id*. Noble's filing of the State Court Suit constitutes a complete disregard of these provisions. The Trust created by the Plan expressly confers on the Trustee the power to prosecute claims belonging to the Trust. [Trustee Exhibit No. 2, Page 6]. Noble's filing of the State Court Suit against Long and the Firm usurps the Trustee's powers to the extent that Noble is prosecuting claims against Long and the Firm that belong to the Trust because the conditions for abandonment were not met.[23] Further, Noble's filing of the State Court Suit jeopardizes the distributions to be made under Article 7 of the Plan because Long and the Firm, pursuant to Section 8.5.1 of the Trust, seek indemnification from the Trust for the attorneys' fees and expenses that they will incur in defending themselves against the causes of action that Noble has brought against them. The amount of these indemnification claims could drain the Trust of its remaining assets and thereby prevent the Trustee from making further distributions under the Plan. For these reasons, the Adversary Proceeding directly relates to the implementation and execution of the Plan, which favors a holding that this Court has jurisdiction over the Adversary Proceeding.

**b.      Factor # 2: Parties involved**

All of the parties in the Adversary Proceeding are integrally associated with the Plan and the Trust. The plaintiff is the Trustee who was named pursuant to the Trust, which was created by the

---

[23] To the extent that Noble, in his individual capacity, has causes of action against Long and the Firm he is free to pursue them, as this Court enjoins him only from prosecuting causes of action that belong to the Trust. To the extent that the parties in this Adversary Proceeding disagree over who owns each of the causes of action that are asserted in the State Court Suit, this Court has jurisdiction to decide that issue.

Plan. [FOF Nos. 5, 6]. One of the defendants, Noble, is the sole proponent of the Plan, the person who nominated the Trustee, and a member of Class 6. [FOF No. 4]. One of the other defendants, Long, is the attorney who represented Noble while Noble was proposing the Plan. [FOF No. 7]. The other defendant, the Firm, is the law firm which represented Noble while he was proposing the Plan. [FOF No. 7]. These circumstances weigh heavily in favor of this Court having jurisdiction over the Adversary Proceeding. This is not a case where, for example, two creditors are litigating in bankruptcy court. *See, e.g., Encompass*, 337 B.R. at 867-868; *EOP-Collonade of Dallas, L.P. v. Faulkner (In re Stonebridge Tech., Inc.)*, 430 F.3d 260, 263 (5th Cir. 2005) (liquidating trustee of a trust created under a plan bringing suit against a lessor). Rather, these are the individuals that were responsible for either obtaining confirmation of the Plan or carrying out the provisions of the Plan and the Trust following confirmation.

Moreover, even though the parties in the Adversary Proceeding are non-debtors,[24] the outcome of this litigation, as already discussed above, could substantially affect the implementation of the Plan. A bankruptcy court may still maintain jurisdiction over non-debtor adversary proceedings, especially when "the claims at issue . . . deal with the parties' pre-petition relationship with the Debtor . . . . *[and] prosecution of the claims asserted . . . is integral to implementation of the Plan.*" *Pam Capital Funding, L.P. v. New NGC, Inc. (In re KEVCO)*, 309 B.R. 458, 468 (Bankr. N.D. Tex. 2004) (finding post-confirmation jurisdiction existed in a non-debtor action where "the *Craig's Stores* test for post-confirmation jurisdiction was satisfied." ) (emphasis added). For these reasons, this second factor weighs substantially in favor of this Court having jurisdiction over the Adversary Proceeding.

### c. Factor # 3: Whether state law or bankruptcy law applies

As already discussed, the Adversary Proceeding very much concerns bankruptcy law. Specifically, the Adversary Proceeding seeks an injunction on the basis that Noble is violating the Plan and the Trust created by the Plan. As already discussed above, the Fifth Circuit's holding in *Shoaf,* which deals with the res judicata effect of a confirmed plan, is applicable in this Adversary Proceeding. [*See* Conclusion of Law No. 7]. The applicability of this bankruptcy law favors this Court having jurisdiction over the Adversary Proceeding.

Alternatively, even if Noble's counsel is correct that the claims at issue are governed by Texas trust law, it is nevertheless the case that a bankruptcy court may have jurisdiction over a proceeding in which only state law issues are present. *See Enron Corp. v. J.P. Morgan Chase & Co. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 314 B.R. 354, 355-357 (S.D. Tex. 2004) (finding that despite the presence of "only state-law claims," bankruptcy jurisdiction existed and remand was not proper because the "claims [were] related to the bankruptcy proceeding with intertwined factual and legal issues."). Here, two key issues are the enforcement of Sections 5.2 and

---

[24] Under Section 6.13 of the Plan, the actual debtor entity that filed the Chapter 11 Petition was dissolved and terminated once the assets were transferred to the Trust upon confirmation of the Plan. [Trustee Exhibit No. 1, Pages 23 - 24].

5.4.2 of the Trust.  These provisions provide that (a) the Trustee, not Noble, has the right to prosecute causes of action Long and the Firm belonging to the Trust; and (b) Noble must come to this Court to resolve any dispute regarding the Trustee's proposal concerning the abandonment of any claim held by the Trust against Long, or the propriety of the vote on this proposal.  The interpretation and enforcement of these specific provisions of the Trust, even if interpreted and enforced under Texas trust law, nevertheless directly pertain to this Chapter 11 case and are intertwined with the legal principle of res judicata.  They pertain to this Chapter 11 case because how these provisions are interpreted and enforced may determine whether the remaining funds in the Trust will be used to pay indemnification claims instead of Class 6 Claims under the Plan. They are intertwined with the legal principle of res judicata because Noble, as the proponent of the Plan, is bound by its terms.

For these reasons, this third factor weighs heavily in favor of this Court having jurisdiction over this Adversary Proceeding.

**d.      Factor # 4: Indices of forum shopping**

Section 6.12(b) of the Plan expressly provides that the Trust shall own all causes of action, including any causes of action against NationsBank, N.A. [Trustee Exhibit No. 1, Page 23].[25] Further, Section 6.5 states that the Trust owns any claims against the Bank. [Trustee Exhibit No. 1, Page 20].  Thus, the Plan specifically recognized the probability of a future action against the Bank and provided that the Trustee would have the authorization to pursue that cause of action. Despite these provisions, Noble, among others, filed the Nueces County Suit against the Bank after confirmation of the Plan. [FOF No. 16].  The Trustee filed an Adversary Proceeding in this Court on July 21, 2003 seeking to enjoin Noble from pursuing these claims. [FOF No. 17].  This Court—specifically, former Bankruptcy Judge William R. Greendyke—thereafter enjoined Noble from prosecuting this suit.  He appealed, and the Honorable Vanessa D. Gilmore, United States District Judge, affirmed this Court's ruling. [FOF No. 18].[26]

---

[25] After confirmation of the Plan, Bank of America, N.A. acquired NationsBank, N.A., and therefore the Judgment signed on May 19, 2004 by Bankruptcy Judge Greendyke, [Trustee Exhibit No. 17, Exhibit C] and the Order affirming this Judgment signed on August 24, 2006 by District Judge Gilmore [Trustee Exhibit No. 17, Exhibit D] makes reference to Bank of America.  Hereinafter, this Court will refer to Bank of America or NationsBank, N.A., as the Bank.

[26] The Court notes that in her Order affirming Bankruptcy Judge Greendyke's ruling, District Judge Gilmore, in rejecting Noble's argument that Judge Greendyke had no jurisdiction over the post-confirmation suit that Noble filed against the Bank, pointed to Sections 6.5 and 6.12(b) of the Plan and, relying upon the Fifth Circuit's holdings in *Craig's Stores* and *U.S. Brass*, held that the issue of whether the causes of actions that Noble brought against the Bank belong to the Trust or to Noble "bear[s] on the interpretation or execution of the debtor's plan, [and falls] within the bankruptcy court's post-confirmation jurisdiction." [Trustee Exhibit No. 17, Exhibit D, Pages 9 - 10].

Having already lost one battle in this Court over the very issue that is now once again being raised—namely, whether Noble may prosecute causes of action that belong to the Trust pursuant to the confirmed Plan—Noble apparently had no desire to comply with Section 5.4.2 of the Trust and come to this Court to resolve any dispute over the Trustee's proposal regarding the conditions for the Trust to abandon any claim that it might have against Long. Rather, Noble simply decided to proceed directly to Harris County District Court and file suit against Long and the Firm. His actions reflect blatant forum shopping. He knew that the Harris County District Court had no background of this bankruptcy case in general or of the Trustee's powers under the Plan and Trust in particular. Noble also apparently believed that given this Court's prior ruling regarding the Nueces County Suit that, if he came into this Court pursuant to Section 5.4.2 of the Trust to complain about the Trustee's proposal, or the vote taken thereon, this Court would not issue a ruling to his satisfaction. Noble therefore filed suit against Long and the Firm in Harris County District Court and apparently crossed his fingers that the Trustee would not seek to enjoin him. The Trustee's filing of this Adversary Proceeding shows that Noble underestimated the Trustee's desire to properly carry out her duties under the Trust.

Noble's forum shopping is particularly egregious because, as this Court has already noted, he is the proponent of the Plan. His blatant disregard of the Plan for which he was the proponent works against him when considering whether this Court has jurisdiction over the Adversary Proceeding. His forum shopping strongly favors this Court's continuing jurisdiction.

### e. Factor # 5: Whether substantial consummation has occurred

In *Encompass,* this Court noted that "An action impacting a confirmed but not substantially consummated plan would have an impact on the debtor-creditor relationship, a factor which favors continuing jurisdiction." *Encompass,* 337 B.R. at 875 (citing *Craig's Stores,* 266 F.3d at 391). In the Chapter 11 case at bar, there is no doubt that substantial consummation has occurred;[27] therefore, at first blush, it would seem that this fifth factor would work against this Court having jurisdiction over the Adversary Proceeding. However, even though substantial consummation has occurred, Noble's act of bringing the State Court Suit may still have a significant effect on the completion of the Plan payments because the very existence and prosecution of the State Court Suit jeopardizes the remaining assets of the Trust due to the indemnification claims asserted by Long and the Firm. Additionally, because the Trust's remaining assets are put in jeopardy, the remaining distributions to Class 6 under the Plan are placed at risk. Accordingly, the action brought by the Trustee against Noble in the Adversary Proceeding definitely has an impact on the relationship between the Trustee (who was appointed pursuant to the Plan) and Class 6 (which includes Noble). Further, the action brought by the Trustee most certainly pertains to the implementation and execution of the Plan. *Craig's Stores,* 266 F.3d at 390-391 ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation and execution of the Plan."). Under these circumstances, the fact that

---

[27] *See* Footnote No. 18.

substantial consummation has already occurred is not a major strike against this Court having jurisdiction over this Adversary Proceeding.

### f. Factor # 6: When the claim at issue arose

There is no doubt that the Trustee's claim against Noble arose well after the confirmation of the Plan; the Trustee had no cause of action against Noble until he filed the State Court Suit in June of this year. Accordingly, this sixth factor weighs against this Court retaining jurisdiction.

25.    In sum, four of the six factors strongly weigh in favor of a holding that this Court has subject matter jurisdiction over the Adversary Proceeding. With respect to the last two factors, even though the Plan is substantially consummated and the Trustee's claim against Noble arose after the confirmation of the Plan, these two factors must be viewed in light of the Adversary Proceeding's potential effect on the implementation of the Plan. In *Craig's Stores*, the Fifth Circuit focused on whether the dispute pertains to the implementation or execution of the Plan. There is no doubt that this Adversary Proceeding directly pertains to the implementation of the Plan. Therefore, although the Trustee's claim arose well after confirmation of the Plan and substantial consummation has occurred—thereby suggesting that this Court does not have jurisdiction—the fact that this dispute so directly pertains to the Plan overrides these two temporal factors.

26.    Under the circumstances set forth above, this Court concludes that the Adversary Proceeding directly pertains to the implementation and the execution of the Plan. Accordingly, at a minimum, the Adversary Proceeding is a related to proceeding under 28 U.S.C. § 1334(b). Therefore, this Court has subject matter jurisdiction over this dispute.

27.    Moreover, this Court concludes that the Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance. Merely because the suit does not fit within any of the sixteen specific categories listed in § 157(b)(2) does not prevent the dispute from being a core proceeding. The language in § 157(b)(2)—i.e. "include, but not limited to"—makes clear that a dispute may still be a core proceeding even though it does not fit within any of the specific sixteen categories. *See, e.g., In re HBG Servicecenter, Inc.*, 45 B.R. 668, 671 (Bankr. S.D.N.Y. 1985)("The specific enumeration of what are core proceedings in 28 U.S.C. § 157(b)(2) is explicitly stated not to be exclusive.") Unfortunately, there is a dearth of case law defining what constitutes a core proceeding when the complaint is filed post confirmation and does not fit within one of the sixteen express catagories of 28 U.S.C. § 157(b)(2). In *In re Southmark Corporation*, 163 F.3d 925 (5th Cir. 1999), the Fifth Circuit reiterated that "a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Southmark*, 163 F.3d at 930 (citing *Wood*, 825

F.2d at 97).[28] Here, the dispute centers around a plan proponent of a confirmed plan (Noble) taking action (filing the State Court Suit) that directly violates the Plan and the Trust that came into existence to due to the confirmation of the Plan. If seeking a post-confirmation injunction against a plan proponent for violating his own confirmed plan is not a core proceeding, then nothing is. This Court concludes that the Adversary Proceeding is a core proceeding.

# IV.
## CREDIBILITY OF WITNESSES

28.   The following witnesses testified:

(a)   Noble C. Ginther, Jr.—It is disappointing that Noble, who is a licensed attorney and a sophisticated individual, was not very knowledgeable about the Trustee's proposals, the votes taken on these proposals, and the State Court Lawsuit. It is clear that Noble has decided to remain aloof from the fray and relies heavily upon his attorneys, particularly Davenport and Ferrell. Noble's testimony is that Ferrell is his attorney "coordinating activities with other attorneys. He has been active and as all these matters arose and I was advised to try to involve myself less in direct family contact, family meetings, Mr. Ferrell, who I have trusted for a long time, I granted a full power of attorney in an effort to preserve my health and sanity." [Transcript of 10/24/06 Hearing, Page 17, Lines 19 - 25]. Moreover, when asked if he would confer with Ferrell before filing any type of lawsuit, Noble responded by saying that "I can think of no circumstance where I wouldn't, but there is no blanket guarantee." [Transcript of 10/24/06 Hearing, Page 18, Lines 11-12]. Further, when asked why he believes that he is not bound by the votes of the Advisory Committee with respect to not posting a bond and filing the State Court Lawsuit, Noble responded "I am represented by several counsel who I believe are good. And I believe I have a right to rely on counsel."[29] [Transcript of 10/24/06 Hearing, Page 41, Lines 13 -15]. Finally, when asked whether he acted independently in filing the State Court Suit, Noble stated: "I would -- I -- No, sir, I can't. I can only tell you I followed the advice of counsel." [Transcript of 10/24/06 Hearing, Page 42, Lines 18 - 21].

---

[28] Although it appears more likely to be pre-confirmation, it is not definitively clear to this Court from a review of *Southmark* whether the suit in that case was filed pre-confirmation or post-confirmation. If the former, then arguably the holding is inapplicable to the suit at bar because the Adversary Proceeding was filed post-confirmation. However, even if *Southmark* concerned a pre-confirmation filed suit, its holding appears to be the most apposite of any existing case. This Court has simply found no cases holding that the definition of a "core proceeding" for a post-confirmation filed suit differs from the definition of "core proceeding" for a pre-confirmation filed suit.

[29]The "several counsel" are Ferrell, Davenport, and Davenport's sister Denise Novotny.

After hearing Noble's testimony, this Court finds that while Noble remained aloof from any communications with the Trustee prior to filing the State Court Suit–allowing his attorneys to communicate with the Trustee and her attorney, Battaglia–it was Noble who ultimately made the decision to file the State Court Suit; indeed, he testified to this effect at the hearing. [Transcript of 10/24/06 Hearing, Page 16, Line 19 through Page 17, Line 7]. The Court also finds that although Noble authorized the filing of the State Court Lawsuit, his decision to do so was certainly influenced by the advice given to him by his attorneys, Ferrell and Davenport.

All in all, this Court is less than enamored with Noble's indifferent attitude toward compliance with the Plan and the Trust.[30] Indeed, Noble exhibited his flippant approach by testifying that, rather than coming to this Court pursuant to Section 5.4.2 of the Trust to complain about the vote regarding the conditions of abandonment, his filing of the State Court Suit was his way of challenging the vote. [Transcript of 10/24/06 Hearing, Page 35, Lines 11 - 13]. It is this sort of disingenuous statement, combined with his nonchalant approach towards suing Long and the Firm under causes of action belonging to the Trust–particularly in view of the fact Judges Greendyke and Gilmore have already issued rulings that he has no standing to sue on behalf of the Trust–that casts legitimate aspersions on Noble's integrity and credibility.

(b)     Stuart Douglas Ferrell— It is disconcerting that Ferrell, a practicing attorney, was not an overly credible witness. Indeed, he was, at times, so evasive in his answers that this Court had to admonish him to answer the question posed to him [Transcript of 10/24/2006 Hearing, Page 104, Line 11 through Page 105, Line 5] and also had to sustain several objections made by opposing counsel as to Ferrell's non-responsiveness.   [Transcript of 10/24/06 Hearing, Page 101, Lines 6-8, 20-22; Transcript of 10/24/06 Hearing, Page 102, Lines 9-16; Transcript of 10/24/06 Hearing, Page 104, Lines 6-15; Transcript of 10/25/06 Hearing, Page 102, Lines 8-24; Transcript of 10/25/06 Hearing, Page 108, Line 18 through Page 109, Line 6].

Ferrell undermined his own credibility through certain testimony that he gave about just exactly whom he represents and for whom he takes actions. On the one hand, he testified that he has continuously served as Noble's attorney since September of 1982, including giving him counsel, among other things, about matters relating to suing Long and the Firm. [Transcript of 10/24/06 Hearing, Page 99, Lines 2 - 13; Transcript of 10/25/06 Hearing, Page 125, Lines 7 - 21]. On the other hand, Noble testified that he represented the Trustee as her attorney from January 28, 2002 to March of 2004 and then from August of 2004 up until the present. [Transcript of

---

[30] The Court is equally disheartened by the attitude of Noble's attorneys toward compliance with the Plan and the Trust, particularly in view of the fact that they, like Noble, were well aware of the rulings relating to the Nueces County Suit.

10/24/06 Hearing, Page 97, Line 12 through Page 98, Line 13; Transcript of 10/25/06 Hearing, Page 96, Line 13 through Page 98, Line 13]. Ferrell went to great lengths to emphasize to this Court that his representation of the Trustee was limited in scope—he gave as an example preparation of tax returns [Transcript of 10/24/06 Hearing, Page 98, Line 20 through Page 99, Line 1; Transcript of 10/25/06 Hearing, Page 128, Lines 14 - 18]. Ferrell further suggested that there was no conflict in voting against the proposals of the Trustee while nevertheless notifying Noble that the statute of limitations was about to run on suing Long and the Firm [Transcript of 10/25/06 Hearing, Page 92, Lines 13 - 17]—a piece of advice that most certainly convinced Noble to file the State Court Suit. Yet, under further questioning, Ferrell conceded that he had no written engagement letter from either the Trustee or Noble setting forth the scope of his representation for either of these persons. [Transcript of 10/24/06 Hearing, Page 99, Lines 14 - 25]. Ferrell also conceded that he does not have written consent from the Trustee to represent Noble at the same time he is representing her; nor does Ferrell have written consent from Noble that he can represent the Trustee while simultaneously representing Noble. [Transcript of 10/25/06 Hearing, Page 126, Line 16 through Page 127, Line 2].

Ferrell's concurrent representation of both Noble and the Trustee raises serious questions regarding a conflict of interest under Texas Rule of Professional Conduct 1.06. Initially, Ferrell claimed that he only represented the Trustee for limited purposes outside of this case. He testified, "My representation of Ms. De Montaigu is to do tax returns. And now I've been tentatively hired to do oil and gas deeds. And that's my only representation of Ms. De Montaigu is just tax returns and these deeds." [Transcript of 10/25/06 Hearing, Page 128, Lines 14-18]. However, Ferrell later contradicted himself and claimed to be a representative agent of the Trustee. "Q: [I]n your capacity as serving on the Advisory Board, were you acting as an agent of the Advisory Board? A: Yes. I was acting as an agent or a director of the Trustee . . . Or the Trust." [Transcript of 10/25/06 Hearing, Page 164, Lines 3-9].

It is apparent, and this Court so finds, that Ferrell's representation and counsel to the Trustee was not limited to filing tax returns. Texas Rule of Professional Conduct 1.06(a) states that "A lawyer shall not represent opposing parties to the same litigation." The issue of whether Noble may prosecute causes of action belonging to the Trust unquestionably places Noble and the Trustee in an adversarial posture over a material point. Ferrell knew, or should have known, of these circumstances when he was counseling Noble about the running of the statute of limitations as to causes of action owned by the Trust against Long and the Firm. Indeed, Ferrell was already aware at this time that Noble had previously been in litigation with the Trustee over this issue when Noble filed the Nueces County Suit. For Ferrell to vote against one client's (the Trustee's) proposals while providing counsel to another client (Noble) which is reasonably calculated to lead to that client (Noble) to take action (filing the State Court Suit) contrary to the wishes of the other client (the Trustee) leads this

Court to conclude that Ferrell's concurrent representation of both parties was improper. Texas Rule of Professional Conduct 1.06 does not provide for client waiver of this form of direct conflict.

Ferrell's dual representation is not the type of conflict that can be waived. Texas Rule of Professional Conduct 1.06(c)(1) only permits a conflict of interest in a "substantially related matter" to be waived when "the lawyer reasonably believes the representation of each client will not be materially affected." Objectively considering the relationship between Noble and the Trustee, no reasonable attorney could honestly believe that counseling one would not have a material effect on the other. This potential conflict blossomed into an actual conflict, and resulted in this Adversary Proceeding.

Further, even assuming that the conflict between Noble and the Trustee was the type which could be waived, Ferrell failed to obtain the adequate consent to permit concurrent representation. Texas Rule of Professional Conduct 1.06(c)(2) requires that "each affected or potentially affected client consents to such representation after full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation." Here, Ferrell does not have written waivers from either party so there is no way to determine if any alleged verbal consent would have come after full disclosure. Moreover, Ferrell testified that he had received oral consent from Noble allowing him to represent the Trustee [Transcript of 10/25/06 Hearing, Page 126, Line 23 - Page 127, Line 2], but Ferrell also testified that he did not have any form of consent from the Trustee to represent Noble. [Transcript of 10/25/06 Hearing, Page 126, Line 16-22]. It is insufficient to have the consent of only the first client; the attorney is required to have the consent of *each* affected party.

Attorneys in the Fifth Circuit are required to "avoid even the appearance of impropriety." *In re Dresser Indus.*, 972 F.2d 540, 543 (5th Cir. 1992) (citing canon 9 of the ABA Model Code of Prof. Responsibility; *Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102, 104 (5th Cir. 1978)). This Court finds that there is an obvious appearance of impropriety in Ferrell's simultaneous representation of Noble and the Trustee; Ferrell should have avoided such dual representation. Ferrell's actions and his testimony attempting to explain away his actions cast a pall over both his integrity and his credibility.

Ferrell further undercut his credibility by testifying that when he cast his vote against the Trustee's proposal setting forth the conditions for abandoning any claim against Long to a beneficiary, he did so "on my independent judgment. . . as a member of the Advisory Committee [representing] the Liquidating Trust." [Transcript of 10/25/06 Hearing, Page 101, Line 18 through Page 102, Line 3]. The Court finds this testimony not to be credible. Throughout this hearing, Ferrell made every effort to

tailor his testimony so as to help Noble fend off the Trustee's attempt to obtain a temporary injunction against Noble. Moreover, even Ferrell himself admitted that he is a close friend and personal confidant of Noble [FOF No.13]; indeed, it was Noble who appointed Ferrell to his seat on the Advisory Committee when Noble resigned. *Id.* Ferrell attempted to convince this Court that his votes against the Trustee's proposals—first, to abandon any claim against Long only if certain conditions were met; and second, to attempt to obtain an injunction against Noble to stop the prosecution of the State Court Suit—reflected his independent judgment rather than his desire to achieve the objective of his client, Noble, to sue Long and the Firm. This Court does not believe Ferrell. [Transcript of 10/25/06 Hearing, Page 101, Line 18 through Page 102, Line 3]. His testimony was tailored to achieve the objective of his good friend, personal confidant, and client, Noble C. Ginther, Jr. Ferrell's bias in favor of Noble and against the Trustee was only too evident as Ferrell gave his testimony at the hearing.

Perhaps the most telling example of Ferrell's bias is his incredible testimony that under Texas law, an attorney is <u>not</u> an agent of the client. Specifically, Ferrell testified that even though Long was the attorney for the Trustee, he was not an agent of the Trustee or the Trust and therefore may not seek indemnification under Section 8.5 of the Trust. [Transcript of 10/25/06 Hearing, Page 98, Line 14 through Page 101, Line 10]. Thus, according to Ferrell, his vote against the Trustee's proposal was entirely reasonable because as a matter of law, since Long and the Firm have no recourse to indemnification, it makes no sense for the Trustee to require anyone wishing to sue Long and the Firm to post a bond.

Texas law is quite clear that an attorney is an agent for the client. *Augustson*, 76 F.3d at 665. This is such black letter law that Ferrell's contrary testimony winds up being nothing more than a poorly disguised attempt to justify Noble's filing of the State Court Suit. Ferrell's testimony that Long was not an agent for the Trust when he represented the Trust allowed Ferrell to take the position that the indemnification provision in the Trust—which, not surprisingly, expressly covers agents of the Trust—does not cover Long and the Firm. Therefore, so Ferrell's argument goes, because the indemnification provision is inapplicable to Long and the Firm, there was no need for the Trustee to propose that a bond be posted as a condition for any beneficiary to sue Long and the Firm. Ferrell's logic does not pass muster. He shaped his testimony to support his long-standing client, good friend, and personal confidant, Noble C. Ginther, Jr. Ferrell's tailored testimony on Noble's behalf undermined his credibility with this Court.

For all of the reasons set forth above, Ferrell was not a credible witness.

(c)     Richard Battaglia—Battaglia was a credible witness.  He was forthright in his testimony and appeared to have a good recollection of the key events regarding the Adversary Proceeding.[31]

## V.
## CONCLUSION

29.     Noble's filing of the State Court Suit is galling because Noble himself is the proponent of the Plan which created the very Trust the terms of which Noble—and his counsel, Ferrell and Davenport—have brazenly disregarded. Indeed, Noble's filing suit against Long and the Firm is particularly disturbing because this is now the second post-confirmation suit that he has brought in state court in violation of the Plan and the Trust. After Noble filed the first post-confirmation suit–i.e. the Nueces County Suit–former Bankruptcy Judge Greendyke ruled that he had no standing to file that suit, and, when Noble appealed, District Judge Gilmore affirmed this ruling.  Noble's filing of the State Court Suit against Long and the Firm despite these prior court rulings underscores Noble's arrogant disregard of his own Plan. This Court will not countenance such action. Based upon this Court's findings of fact and conclusions of law, this Court grants the Plaintiff's Request for Preliminary Injunction. A separate order will be entered on the docket simultaneously with the entry on the docket of this Memorandum Opinion.


Signed this 22nd day of December, 2006.


_____
Jeff Bohm
U.S. Bankruptcy Judge

---

[31] This Court disagrees, however, with Battaglia's testimony that Ferrell never voted on the Trustee's proposal. [Transcript of 10/25/06 Hearing, Page 11, Lines 17-18].  This Court holds that Ferrell voted against the Trustee's proposal by virtue of sending his July 28, 2005 letter to Battaglia responding to the Trustee's proposal. [FOF No. 23].  Merely because Ferrell did not sign the ballot as the other members did does not mean that he did not vote.  The language in his letter reflects that he was against the conditions set forth in the proposal for the Trust to abandon any causes of action that it might have against Long or the Firm.

cc:   (1)     Bruce Watkins
               Watkins & Watkins
               24 Greenway Plaza, Suite 1210
               Houston, Texas 77046

      (2)     Valorie W. Davenport
               Davenport Legal Group
               305 Glenwood Drive
               Houston, Texas 77007

      (3)     Richard A. Battaglia
               P. O. Box 131276
               Houston, Texas 77219-1276

      (4)     Russell D. Weaver
               14275 Midway Road, Suite 160
               Addison, Texas 75001

      (5)     Allan D. Goldstein
               1980 Post Oak Blvd., Suite 700
               Houston Texas 77056

      (6)     Charles E. Long
               Stumpf, Craddock, Massey & Farrimond
               1400 Post Oak Blvd., Suite 400
               Houston, Texas 77056